# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JERMAINE ARNET COOPER,

        Defendant-Appellant.

UNPUBLISHED
June 7, 2018

No. 336662
Kent Circuit Court
LC No. 16-001841-FC

Before: RONAYNE KRAUSE, P.J., and MARKEY and RIORDAN, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of second-degree murder, MCL 750.317, [1] and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, for which he was sentenced as a fourth-habitual offender, MCL 769.12, to consecutive terms of 750 months' to 100 years' imprisonment and 2 years' imprisonment, respectively. We affirm.

## I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

Defendant was in a long-term relationship and living with victim MM in Holland, Michigan, on November 5, 2015. Several people witnessed defendant and the victim arguing that day. Defendant accused the victim of blocking him from calling her cellular telephone and expressed jealousy at the possibility of other suitors. At approximately 4:00 a.m. of the following morning, November 6, 2015, members of a Grand Rapids City street-sweeping crew saw the victim exit a black Cadillac, scream for help, and get shot five times by a black male wearing a varsity-type jacket with sports-related patches. Several witnesses that lived near the scene of the crime described hearing the victim's screams for help and hearing gunshots. One such witness saw a black male who was approximately 6 feet tall and 200 pounds get back into the vehicle and drive away after the shooting. The victim died from a gunshot wound to her neck before police or an ambulance arrived.

---

[1] Defendant was tried on a charge of open murder, MCL 750.316.

After speaking with witnesses, the police identified defendant as a suspect in the case. Defendant, however, fled from police, eventually hiding out in a house in Detroit. When police surrounded the house approximately one month after the murder, defendant refused to surrender even after 70 canisters of tear gas were projected into the home. However, defendant ultimately was arrested and charged with open murder and felony-firearm.

His trial took place over the course of six days, during which the prosecution offered evidence that defendant was 6 feet, 2 inches tall and 170 pounds; he owned a gun that matched the bullets and shell casings found at the scene of the crime, in the car defendant often drove, and in defendant's bedroom; he often wore a varsity-style jacket that matched the eye-witnesses' descriptions; a keychain he was known to carry was found at the scene of the crime; his cellular telephone data showed that he travelled from Holland to Grand Rapids between 3:30 a.m. and 4:00 a.m.; the black Cadillac out of which the victim exited was often driven by defendant and was recovered in the parking lot of the apartment complex where defendant's brother, Brian Cooper, lived; surveillance video showed the black Cadillac arriving at Brian's apartment at 4:21 a.m.; one of the victim's gunshot wounds was consistent with being shot by someone in the driver's seat of a car while she was sitting in the passenger seat of a car; the victim's blood, DNA, and belongings were found in the black Cadillac; and defendant sent an apologetic text message to the victim's 15-year-old son, JB, at 4:46 a.m.

The prosecution theorized that defendant was angry with the victim due to jealousy, drove her to Grand Rapids where he shot and killed her, and then fled with the help of his brother and mother. Defendant presented a defense of mistaken identity. He claimed that someone else shot and killed the victim when she went out by herself to buy drugs. Defendant contended that the crime was meant as a punishment for him and was likely committed by the same person that shot his ex-girlfriend and mother of two of his children, SW, when defendant was in jail.

The defense theory relied on SW's testimony about the shooting, the toxicology report from the victim's autopsy that showed she had prescription drugs and cocaine in her blood at the time of her death, and alleged errors in the police investigation of the victim's death and their failure to connect it to SW's shooting. The prosecution called SW as a witness, and during direct examination, she testified that she was shot after defendant was already in jail. On cross-examination, defendant elicited testimony from SW that she reported her shooting to the officers investigating the victim's murder, but that they did not seem interested in her information and never determined her assailant. During redirect, the prosecution asked SW about the specifics of her shooting. SW testified that, on the day she was shot, she was driving to her brother's residence to pick someone up. When she arrived, a robbery was in progress. SW acknowledged that she was not normally at that residence during the day, suggesting that someone would not be able to expect her presence there. Further, SW testified that one person living at the residence informed her that several masked men entered the residence and attempted a robbery. SW did not testify that the masked men entered the residence looking for her. Additionally, SW stated that she was still outside when the masked men exited the residence, where she was shot by one of them while they escaped. Although shot, SW was able to flee from the area, and her shooter did not give chase.

Despite the obvious dissimilarities in the shootings and clear indications that the shooters were not there to kill her, when asked by the prosecution if she thought the two shootings were

related, SW said that she could not be sure.  In an attempt to show her bias, the prosecution then asked SW if she was afraid of defendant.  SW denied being afraid of him.  The prosecution then asked SW if she previously was physically assaulted by defendant just before the murder was committed.  SW testified that they had a "disagreement," but that their interaction was not physical.  The prosecution impeached SW with a previous statement she made to the police that shortly before the murder, she and defendant argued when defendant expressed jealousy about SW possibly seeing another man.  SW told the police that defendant pushed her down, which caused her to hit her head on some furniture.  SW spent some time in the hospital and had a scar from the incident.  SW continued to deny her previous statement at trial, asserting that her interaction with defendant was not physical.  The prosecution later called Officer Allen, who took the original statement from SW, to corroborate that SW had previously complained to him about defendant's abuse shortly before the murder.

Ultimately, the jury convicted defendant of second-degree murder and felony-firearm and the trial court sentenced defendant accordingly.  Defendant moved for a new trial, asserting that the prosecution had committed misconduct during closing argument.  The trial court denied that motion.  This appeal followed.  Defendant brings claims regarding the sufficiency of the evidence, prosecutorial misconduct, other acts evidence, ineffective assistance of counsel, his motion for a new trial, and ex parte communication.

## II.  SUFFICIENCY OF THE EVIDENCE

Defendant, in his Standard 4 brief, argues that there was insufficient evidence to convict him of second-degree murder.  We disagree.

### A.  STANDARD OF REVIEW & GENERAL LAW

"We review de novo a challenge on appeal to the sufficiency of the evidence." *People v Henry*, 315 Mich App 130, 135; 889 NW2d 1 (2016), quoting *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010).  "To determine whether the prosecutor has presented sufficient evidence to sustain a conviction, we review the evidence in the light most favorable to the prosecutor and determine 'whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' " *People v Smith-Anthony*, 494 Mich 669, 676; 837 NW2d 415 (2013), quoting *People v Tennyson*, 487 Mich 730, 735; 790 NW2d 354 (2010).  "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Bailey*, 310 Mich App 703, 713; 873 NW2d 855 (2015), quoting *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).

There is sufficient evidence for a guilty verdict where "a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *Tennyson*, 487 Mich at 735.  "The prosecution need not negate every reasonable theory of innocence, but need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant." *People v Henderson*, 306 Mich App 1, 9; 854 NW2d 234 (2014).  "Circumstantial evidence and the reasonable inferences that arise from that evidence can constitute satisfactory proof of the elements of the crime." *People v Blevins*, 314 Mich App 339, 357; 886 NW2d 456 (2016).  Any and all conflicts that arise in the evidence must be resolved "in favor of the prosecution." *Henderson*, 306 Mich App at 9.  "It is for the trier of fact, not the appellate court, to determine

what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). "In order to convict a defendant of second-degree murder, the prosecution must prove: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Roper*, 286 Mich App 77, 84; 777 NW2d 483 (2009) (internal quotation marks omitted). Further, "it is well settled that identity is an element of every offense." *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008).

Defendant challenges only the identity element of the crime. "[T]his Court has stated that positive identification by witnesses may be sufficient to support a conviction of a crime," and that "[t]he credibility of identification testimony is a question for the trier of fact that we do not resolve anew." *People v Davis*, 241 Mich App 697, 700; 617 NW2d 381 (2000). A perpetrator's identity can be established by evidence that is entirely "circumstantial and sometimes requires reliance on an inference founded on an inference . . . ." *People v Bass*, 317 Mich App 241, 264; 893 NW2d 140 (2016).

## B. ANALYSIS

There is significant circumstantial evidence of defendant's identity as the person who shot and killed the victim. Four separate witnesses testified that they saw defendant and the victim arguing in the afternoon preceding the murder. JB stated that although defendant and the victim sometimes argued, the argument that occurred on the day in question was longer and more intense than previous arguments. Tania Gomez, the victim's best friend, was surprised at the intensity of the argument, stated that defendant did not seem like himself, and was worried when the victim refused to leave with Gomez when defendant demanded that she stay. Cheata Lor, who was familiar with defendant and the victim as patrons of her party store, testified that she often saw defendant and the victim in her store, but that she had never seen them argue before. She also noted that defendant made statements expressing jealousy, indicating his belief that the victim was seeing another man. JB stated that the fight went on most of the day and night, dying down at around 10:00 p.m.

Defendant's cellular telephone records showed that between 3:30 a.m. and 4:00 a.m., he travelled from Holland, where he and the victim had been arguing, to Grand Rapids. In Grand Rapids, at around the same time defendant's cellular records show that he arrived in the city, a street-sweeping crew saw the victim exit the passenger door of a black Cadillac and get shot. A multitude of witnesses testified that defendant primarily drove the black Cadillac. Although the street-sweeping crew could not positively identify defendant as the shooter, one street sweeper described the shooter as a black male wearing a varsity-type jacket with sports-related patches on the sleeves. DC, defendant and the victim's 11-year-old son, and JB, who both lived with defendant, and defendant's neighbor, testified that defendant owned and wore a jacket matching that description. DC also testified that a penguin keychain found at the murder scene belonged to defendant. Further, a witness that lived near the scene of the murder stated that he saw a black male of a body-type similar to defendant's run from the scene of the crime and drive away in a black car. A reasonable juror could infer that defendant was the shooter where defendant's cellular telephone placed him in Grand Rapids, his keys were found at the scene of the murder, the shooter and the victim exited a vehicle matching the description of a car that defendant

regularly drove, the shooter was wearing a jacket that looked like a jacket which defendant was known to wear, and a witness described the shooter as having a similar body-type to defendant's.

The cellular telephone records then showed that Brian, defendant's brother who lived 2.6 miles from the scene of the crime, called, and received two calls from, defendant within 10 minutes of the shooting. Within 15 minutes of a conversation between defendant and Brian, a security camera showed the black Cadillac pull into the parking lot of Brian's apartment complex, drive all the way to the back of that parking lot, and park. The vehicle was later discovered in that parking lot and verified to be the black Cadillac that defendant regularly drove. Inside of the car, the police discovered the victim's blood, DNA, belongings, and cash; ammunition corresponding to that used to kill the victim; and receipts from Georgia, where defendant worked. From that evidence, a reasonable juror could infer that after killing the victim, or immediately before, he attempted to get into contact with his brother. When he was finally able to do so, he drove to his brother's apartment complex and abandoned the black Cadillac, which was clearly connected to the murder. Further, jurors could infer that the black Cadillac being driven to that spot immediately after leaving the shooting showed that defendant was the shooter, because it is logical that defendant would drive to a family member's residence. Moreover, the Georgia receipts in the car support that defendant regularly drove it, the ammunition and the victim's blood suggested that she was shot and beaten therein, and the money left in her wallet created an inference that the victim was not killed during a robbery. All of that evidence points directly to defendant as the shooter.

There is additional circumstantial evidence that defendant sent an emotional text to JB, essentially saying goodbye to him, and spoke with two of his other children in a manner that suggested he would not see them again. A reasonable juror could infer that defendant made those communications because he was concerned that he was going to go to jail after murdering the victim. The apologetic nature of the text message to JB, who was the victim's son, and the sad but not apologetic nature of his communication with his other children, who were SW's children, create a logical inference that defendant was apologizing to JB for murdering his mother.

Another inference that defendant was the shooter could be made from the firearms evidence. Testimony from JB, DC, and defendant's other brother, Michael Kitchen, supported that defendant owned a Glock 9-mm handgun. That testimony was corroborated by magazine clips and bullets that would fit that gun being found in defendant's residence. A firearms expert stated that the spent shell casings and fired bullets were compatible with a Glock 9-mm handgun. This included the bullets found in defendant's house, the shell casing and bullet found in the car defendant often drove that also contained the victim's blood, and the shell casings and jacket found at the scene of the murder. That evidence plainly allows for an inference that defendant used his Glock 9-mm gun to shoot and kill the victim.

The prosecution also presented evidence that defendant fled after the victim's death. Cellular telephone records support that defendant's mother, Rita Cooper, was in Grand Rapids at around the time of the murder, that defendant was with her at some point when he called SW and his children from Rita's telephone, and that she travelled from Grand Rapids to Muskegon during the early morning hours shortly following the murder. A reasonable juror could infer that defendant got in contact with his mother and asked her to drive him to some place that he could

hide from the police. Defendant's flight from the scene of the crime, however, did not stop in Muskegon. The police eventually found defendant, after approximately one month of searching, at a house in Detroit—the other side of the state of Michigan from Muskegon. Even when defendant was surrounded by police and they filled the house he was in with tear gas, he still continued his attempts to evade arrest.

It is well established law in Michigan that a defendant's flight is evidence of his guilty conscience. *People v Unger*, 278 Mich App 210, 226; 749 NW2d 272 (2008). Thus, a reasonable juror could infer that defendant fled to Muskegon and then Detroit because of his guilt and he was attempting to evade prosecution. *Id*. When police finally tracked him down, his continued refusal to exit the surrounded and tear gas filled house show that he was not likely fleeing from some drug dealers that were out to get him, as suggested by SW's testimony and that defendant offered in his defense. A logical juror could infer that, if defendant truly was fleeing from potential harm at the hands of a drug dealer, he would have freely exited the Detroit house and to potential safety when he was made aware that the police were outside. Instead, the evidence suggests that defendant was hiding from police because he murdered the victim. See *id*.

Considering all of this circumstantial evidence—and the reasonable inferences therefrom—there was sufficient evidence to support a jury's decision that defendant was angry with the victim due to jealousy, drove her to Grand Rapids where he beat her and shot her with his gun while she still was in the car, shot her four more times when she attempted to escape, drove to his brother's house to hide his vehicle, got a ride from his mother to Muskegon, and then attempted to hide out and evade arrest in Detroit.

Defendant's contention is essentially that there was no direct evidence of his identity as the shooter. But Michigan law does not require direct evidence of identity, and the circumstantial evidence provided by the prosecution that defendant shot and killed the victim is very substantial. *Bass*, 317 Mich App at 264. There was sufficient evidence of defendant's identity to convict him of second-degree murder. See *id*.

## III. PROSECUTORIAL MISCONDUCT

Defendant argues that the prosecution committed misconduct requiring reversal during closing arguments. Defendant argues that the prosecution improperly disparaged defense counsel, asserted facts not in evidence, and shifted the burden of proof to defendant. There being no error requiring reversal, we disagree.

## A. PRESERVATION & STANDARD OF REVIEW

In cases alleging prosecutorial misconduct, there must be a "contemporaneous objection or request for a curative instruction in regard to any alleged error" in order to preserve the issue for review before this Court. *People v Brown*, 279 Mich App 116, 134; 755 NW2d 664 (2008). Defendant objected to the relevant portions of the prosecution's closing argument on the grounds that the prosecution was disparaging defense counsel and arguing facts not in evidence. Thus, those issues are preserved for review. *Id*. However, defendant did not object on the ground that the prosecution was shifting the burden of proof to him. "[A]n objection on one ground is

insufficient to preserve an appellate argument based on a different ground." *People v Danto*, 294 Mich App 596, 605; 822 NW2d 600 (2011). Thus, defendant's objections related to the prosecution's disparaging defense counsel statement and assertion of facts not in evidence did not preserve his argument with respect to burden shifting. See *id.* Consequently, that portion of defendant's argument on appeal is not preserved for this Court's review. *Id.*; *Brown*, 279 Mich App at 134.

For the preserved issues, "a claim of prosecutorial misconduct is a constitutional issue that is reviewed de novo, but a trial court's factual findings are reviewed for clear error." *Brown*, 279 Mich App at 134. For defendant's burden shifting contention, which was not preserved for review, this Court must review the "unpreserved claim for plain error affecting defendant's substantial rights." *People v Roscoe*, 303 Mich App 633, 648; 846 NW2d 402 (2014). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). In order to show that a defendant's substantial rights were affected, there must be "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id.* As such, "[r]eversal is only warranted if defendant was actually innocent and the plain error caused defendant to be convicted or 'if the error "seriously affected the fairness, integrity, or public reputation of judicial proceedings," ' regardless of defendant's innocence." *Roscoe*, 303 Mich App at 648, quoting *People v Thomas*, 260 Mich App 450, 454; 678 NW2d 631 (2004), quoting *People v Ackerman*, 257 Mich App 434, 449; 669 NW2d 818 (2003).

## B. APPLICABLE LAW & ANALYSIS

"Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). When considering allegations of prosecutorial misconduct, this Court must "examine the entire record and evaluate a prosecutor's remarks in context." *Id.* at 64. "[A] prosecutor is free to argue the evidence and all reasonable inferences arising from it as [it] relate[s] to . . . [the] theory of the case." *People v Johnson*, 315 Mich App 163, 201; 889 NW2d 513 (2015) (internal quotation marks omitted; alterations in original). "The prosecution has wide latitude in arguing the facts and reasonable inferences, and need not confine argument to the blandest possible terms." *Dobek*, 274 Mich App at 66.

However, the prosecution is not permitted to "imply . . . that the defendant must prove something or present a reasonable explanation for damaging evidence because such an argument tends to shift the burden of proof." *People v Fyda*, 288 Mich App 446, 463-464; 793 NW2d 712 (2010). Although, "[w]here a defendant . . . advances, either explicitly or implicitly, an alternate theory of the case that, if true, would exonerate the defendant, comment on the validity of the alternate theory cannot be said to shift the burden of proving innocence to the defendant." *People v Reid*, 233 Mich App 457, 478; 592 NW2d 767 (1999) (internal quotation marks omitted). Similarly, "[a]rguments regarding the weight and credibility of the witnesses and evidence presented by defendant do not shift the burden to the defendant to prove his innocence, but rather question the reliability of the testimony and evidence presented." *People v Fields*, 450 Mich 94, 107; 538 NW2d 356 (1995). Simply stated, "attacking the credibility of a theory

-7-

advanced by a defendant does not shift the burden of proof." *People v McGhee*, 268 Mich App 600, 635; 709 NW2d 595 (2005). Further, "a prosecutor may not argue facts not in evidence or mischaracterize the evidence presented . . . ." *People v Watson*, 245 Mich App 572, 588; 629 NW2d 411 (2001).

## 1. ALLEGED PROSECUTORIAL ERRORS

First, considering the preserved issues, defendant challenges the prosecution's statement during an objection, and then later during rebuttal, that the gun used to shoot SW was not the same gun that was used to shoot and kill the victim. Defendant is correct that the prosecution asserted that the record contained evidence establishing that the gun used in SW's shooting was not the same as the gun used in the victim's murder. A review of the record, however, provides that no such evidence was ever admitted during trial. Regardless of the veracity of the prosecution's claim that the guns were indeed different, the issue remains that such evidence had not been properly admitted at trial. Thus, the prosecution improperly argued facts not in evidence. *Watson*, 245 Mich App at 588. However, as further discussed, *infra*, that error is not grounds for reversal.

Defendant also argues that the prosecution inappropriately disparaged defense counsel by calling him "dishonest." At another point during rebuttal, the prosecution asserted that defense counsel was attempting to "trick" the jury. "It is true that a prosecuting attorney may not personally attack defense counsel." *People v McLaughlin*, 258 Mich App 635, 646; 672 NW2d 860 (2003). Furthermore, the prosecution "may not suggest that defense counsel is intentionally attempting to mislead the jury." *Unger*, 278 Mich App at 236 (internal quotation marks omitted). When the prosecution called defense counsel "dishonest," and indicated that he was attempting to "trick" the jury, she was "in effect stating that defense counsel does not believe his own client . . . [an] argument [that] undermines the defendant's presumption of innocence . . . [and] impermissibly shifts the focus from the evidence itself to the defense counsel's personality." *Id.*, quoting *People v Wise*, 134 Mich App 82, 101-102; 351 NW2d 255 (1984). Such an argument also was in error but, again, this does not require reversal.

Lastly, in his unpreserved argument, defendant challenges the portion of the prosecution's rebuttal argument during which the prosecution asserted that evidence that the gun used in both shootings was the same or that defendant was somewhere else other than the scene of the crime would undoubtedly have come out during trial, if it existed. Defendant asserts that the prosecution's argument essentially shifted the burden of proof onto defendant to prove his innocence.

During defendant's opening statement and closing argument, he repeatedly alleged that there was a likelihood that the shooting of SW was related to the victim's murder. Defendant asserted that the police did not properly investigate SW's shooting, so the jury was left to guess whether or not the gun used to shoot SW was the same gun used to kill the victim. Defendant posited that the prosecution likely did not ask the police about that possibility because the government did not want its case tainted. On rebuttal, the prosecution directed the jury's attention to the fact that defense counsel was permitted to ask the officers if the gun used in both crimes was the same, but he had not. The prosecution suggested that if such evidence existed, defense counsel would have promptly and repeatedly asked such a question of the officers. The

prosecution also commented on the likelihood that defendant was somewhere other than the scene of the murder, noting that all of the evidence—including cellular telephone data, eye witness testimony regarding the car and the man that was driving it, and the place the police found the black Cadillac—strongly suggested that defendant was with the victim in the vehicle when she was shot and killed. The prosecution commented on the fact that all of the evidence placed defendant at the scene of the crime, and that no evidence placed him anywhere else.

The statements by the prosecution regarding the similarity of the shootings did not shift the burden of proof to defendant, but merely commented "on the validity of [his] alternate theory of the case that, if true, would exonerate [him] . . . ." *Reid*, 233 Mich App at 478 (internal quotation marks omitted). Defendant claimed that someone else must have shot the victim, because a similar shooting occurred while he was in jail. If the jury believed that legal theory, defendant would have been exonerated. Thus, although the prosecution was not permitted to explicitly state that the guns used in each shooting were different, as the report establishing that fact was not admitted as evidence, the prosecution *was* permitted to comment on the validity of defendant's theory of the case by pointing out the dearth of evidence that the crimes were similar, including a lack of evidence that the guns were the same. Further, the prosecution did not err when noting that defense counsel would have pursued that line of questioning with investigating officers during cross-examination if it was helpful to his case. However, this would have placed additional focus on the lack of evidence that the shootings were connected, as defendant had argued in the opening and closing arguments. From that, the prosecution urged the jury to infer that the shootings were dissimilar. The prosecution properly attacked the veracity of defendant's theory of the case, and permissibly argued inferences arising from the evidence presented at trial in argumentative terms. *Id*.; *Dobek*, 274 Mich App at 66.

The prosecution also argued inferences arising from the evidence when she stated that defendant was at the scene of the crime and no other evidence placed him anywhere else. Most of the prosecution's arguments on that account were based on inferences from the evidence, which suggested that only the defendant was at the scene of the crime. Clearly, the prosecution was permitted to argue that defendant was at the scene of the crime as an inference arising from abundant circumstantial evidence establishing that he was there and a lack of evidence establishing that he was anywhere else. See *id*.; see also *Reid*, 233 Mich App at 478.

However briefly, the prosecution did suggest that defendant should have or would have introduced evidence of his whereabouts if there was proof that he was anywhere other than the murder scene. That argument, instead of commenting on the lack of evidence, could tend to place the burden on defendant that he should have provided proof of where he was at the time of the murder. This was improper to do. But, although those comments might have resulted in error, this Court has held that "[a]n otherwise improper remark may not rise to an error requiring reversal when the prosecution is responding to the defense counsel's arguments." *Watson*, 245 Mich App at 593 (internal quotation marks omitted). Here, the prosecution was responding to defense counsel's repeated assertions that the police had not properly investigated the crime. In rebutting that argument, the prosecution properly noted that every piece of evidence supported that defendant was at the scene of the crime. The prosecution was not required to make those arguments in the "blandest possible terms." *Dobek*, 274 Mich App at 66.

## 2. HARMLESS ERROR OR PREJUDICE

" 'A constitutional error is harmless if "[it is] clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." ' " *People v Shepherd*, 472 Mich 343, 347; 697 NW2d 144 (2005), quoting *People v Mass*, 464 Mich 615, 640 n 29; 628 NW2d 540 (2001), quoting *Neder v United States*, 527 US 1, 19; 119 S Ct 1827; 144 L Ed 2d 35 (1999). For unpreserved arguments, defendant is required to prove that his substantial rights were affected by the error, namely that the outcome of trial would have been different but for the errors. *Carines*, 460 Mich at 763. "Curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements." *People v Seals*, 285 Mich App 1, 22; 776 NW2d 314 (2009).

Immediately following the prosecution's statement that defense counsel was "dishonest," the trial court instructed the jury that the attorneys' statements were only related to their theories of the case, but that the jury was charged with deciding the case based only on the evidence. Later, during the final jury instructions, the trial court informed the jury that the attorneys' statements and arguments were not evidence and should not be considered as proof of any facts. The trial court specified that the lawyers' comments "are only meant to help you understand the evidence and each side's legal theories." In light of the extensive amount of evidence presented at trial, and considering the relatively very brief reference to defense counsel's dishonesty, of evidence not in the record, and oblique inference of burden shifting in the prosecution's closing, we conclude that error arising out of those statements was cured by the trial court's instructions. See *Seals*, 285 Mich App at 22. Further, even disregarding the jury instructions, any error was harmless beyond a reasonable doubt, and thus, was also not outcome determinative. As noted, *supra*, the evidence that defendant murdered the victim is substantial even though it is circumstantial.

Additionally, the crux of defendant's prosecutorial misconduct arguments is that the prosecution improperly asserted that defense counsel was misleading the jury by suggesting that SW's shooting was related to the victim's death. To wit, defendant contends that the prosecution erred by saying defense counsel was "dishonest" for asserting the theory, arguing facts not in evidence regarding the guns used in each shooting, and shifting the burden of proof defendant to show that he was not in the car with the victim. However, the evidence admitted at trial plainly established that the two shootings were unrelated. The defense theory was that someone intended to kill the victim and SW as some sort of punishment for defendant. Despite that theory, on cross-examination, SW testified that she was shot only after interrupting a robbery taking place at her brother's residence. In other words, the purpose of the shooting was a robbery, which SW had the misfortune of happening upon, and was not related in any way to defendant nor was its purpose to shoot and kill SW. This was further supported by SW's testimony that the shooters did not chase her when she ran away from the scene. Thus, even without the prosecution's alleged errors in closing, the jury already was presented with abundant evidence of not only defendant's guilt, but that the defense theory of retaliatory shootings of the mothers of defendant's children was completely unsupported by the evidence admitted at trial.

Consequently, we hold that reversal is not warranted because any errors were harmless beyond a reasonable doubt and not outcome determinative. *Shepherd*, 472 Mich at 347; *Carines*, 460 Mich at 763.[2]

## IV. EVIDENCE OF WITNESS BIAS

Defendant argues that evidence of his previous physically abusive interactions with JB and SW was inadmissible. We disagree.

### A. STANDARD OF REVIEW

"When the issue is preserved, we review a trial court's decision to admit evidence for an abuse of discretion, but review de novo preliminary questions of law, such as whether a rule of evidence precludes admissibility." *People v Chelmicki*, 305 Mich App 58, 62; 850 NW2d 612 (2014). "A trial court abuses it discretion when its decision results in an outcome falling outside the range of principled outcomes." *People v Winters*, 320 Mich App 506, 509; 904 NW2d 899 (2017). "[W]hen such preliminary questions of law are at issue, it must be borne in mind that it is an abuse of discretion to admit evidence that is inadmissible as a matter of law." *Henry*, 315 Mich App at 143, quoting *People v Lukity*, 460 Mich 484, 488; 596 NW2d 1607 (1999).

### B. APPLICABLE LAW & ANALYSIS

Defendant challenges evidence introduced regarding previous instances where he was physically violent toward JB and SW. Defendant asserts that the evidence was inadmissible other acts evidence under MRE 404(b). Contrary to defendant's arguments, we hold that the evidence challenged was properly admitted to show JB's and SW's possible bias. Given that conclusion, we need not address MRE 404(b) because "[t]hat our Rules of Evidence preclude the use of evidence for one purpose simply does not render the evidence inadmissible for other purposes." *Yost*, 278 Mich App at 355, quoting *People v Sabin (After Remand)*, 463 Mich 43, 56; 749 NW2d 753 (2008).[3]

---

[2] In reaching this conclusion, we do not wish to minimize the errors made by the prosecutor during her closing arguments. In a different, factually closer case, the errors would not be so easily cured. As the case stands, however, the circumstantial evidence establishing that defendant shot and killed the victim is overwhelming, so we see no reason for a new trial.

[3] Briefly, even if we were to consider the evidence pursuant to MRE 404(b), we note it was still properly admitted because it satisfied the test espoused by our Supreme Court in *People v VanderVliet*, 444 Mich 52; 508 NW2d 114 (1993). Where the evidence was provided for a proper purpose, to show JB's and SW's bias, the evidence was logically relevant to the stated purpose, the high probative value of the evidence was not substantially outweighed by any possible unfair prejudice, and the trial court provided a limiting instruction on other acts evidence as requested by defendant. See *People v Martzke*, 251 Mich App 282, 290; 651 NW2d 490 (2002) (holding that although not included in the non-exhaustive list of proper purposes for

"Bias is a term used in the 'common law of evidence' to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party." *People v Layher*, 464 Mich 756, 763; 631 NW2d 281 (2001), quoting *United States v Abel*, 469 US 45, 52; 105 S Ct 465; 83 L Ed 2d 450 (1984). "Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest." *Layher*, 464 Mich at 763 (internal quotation marks omitted). "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *Id*. (internal quotation marks omitted). Our Supreme Court clarified that evidence of a witness's potential bias is admissible "where, in its sound discretion, the trial court determines that the admission of evidence is consistent with the safeguards of the Michigan Rules of Evidence." *Id*. at 758. In considering those "safeguards," the Court held that so long as the evidence was logically relevant to a witness's bias pursuant MRE 402 and its probative value was not substantially outweighed by the danger of unfair prejudice pursuant to MRE 403, then the evidence was properly admitted. *Id*.

"[L]ogical relevance is determined by the application of MRE 401 and MRE 402." *People v Denson*, 500 Mich 385, 400; 902 NW2d 306 (2017). "We have emphasized the importance of logical relevance, calling it the 'touchstone' of [] admissibility . . . ." *Id*. "Relevance is a relationship between the evidence and a material fact at issue that must be demonstrated by reasonable inferences that make a material fact at issue more probable or less probable than it would be without the evidence." *People v Crawford*, 458 Mich 376, 387; 582 NW2d 785 (1998). Meanwhile, logically relevant evidence might still be excluded where "its probative value is substantially outweighed by the danger of unfair prejudice." MRE 403. Notably, MRE 403 does not regulate evidence that is simply "prejudicial" because "[r]elevant evidence is inherently prejudicial." *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995) (internal quotations omitted). Rather, "[i]t is only when the probative value is *substantially outweighed* by the danger of unfair prejudice that evidence is excluded." *Id*. There is, therefore, a two-part test: "[T]his Court must make two distinct inquires under the balancing test of MRE 403. First, this Court must decide whether introduction of [the] evidence at trial was unfairly prejudicial. Then, this Court must apply the balancing test and weigh the probativeness or relevance of the evidence against the unfair prejudice." *People v Cameron*, 291 Mich App 599, 611; 806 NW2d 371 (2011) (internal quotation marks omitted).

"Unfair prejudice may exist where there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence." *People v Gipson*, 287 Mich App 261, 263; 787 NW2d 126 (2010), quoting *People v Blackston*, 481 Mich 451, 460; 751 NW2d 408 (2008). Stated differently, the "major function [of MRE 403] is limited to excluding matters of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Mills*, 450 Mich at 75 (internal quotations omitted). Such concerns arise where "the tendency of the proposed evidence [is] to adversely affect the

---

admission of other acts evidence in MRE 404(b)(1), "another proper purpose of other acts evidence . . . is evidence offered to expose a witness' bias.").

objecting party's position by injecting considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock." *Cameron*, 291 Mich App at 611 (internal quotation marks omitted). Additional concerns include "the danger of confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *People v Watkins*, 491 Mich 450, 489; 818 NW2d 296 (2012) (internal quotation marks omitted).

The challenged evidence was logically relevant to exposing the biases of JB and SW, thereby rebutting defendant's claim of mistaken identity. The defense's theory of the case was that an unidentified person shot and killed the victim in a drug-related crime with the intent to punish defendant for unknown reasons. That defense primarily relied on the lack of direct, eye-witness testimony specifically identifying defendant as the shooter, and allegations that SW's shooting was similarly motivated to the victim's murder. Thus, circumstantial evidence of defendant's identity as the shooter generally, and evidence that SW's shooting and the victim's murder were entirely unrelated, specifically, were two factual concerns regarding the only significant and contested issue at trial—defendant's identity as the victim's murderer.

During JB's testimony, the prosecution asked JB whether defendant kept a gun in the house. JB responded that defendant did, that JB had seen it on previous occasions, heard it referred to as a "Glock" or a "9," and that he had shot it in a field with defendant. When prompted by the prosecution, JB acknowledged that the first time he met with the police he did not divulge any information about defendant's gun. When the prosecution asked him why he did not tell the police immediately, JB said that he was afraid of defendant because defendant previously physically abused him.

During direct examination by the prosecution, SW brought up her shooting that took place after the murder. Then, on cross-examination, defense counsel thoroughly questioned SW on those events, eliciting testimony supporting defendant's claim of mistaken identity. During re-direct examination, the prosecution asked SW if she was afraid of defendant and whether defendant previously had pushed her down and injured her. When SW denied those events, the prosecution impeached her with her previous statement to police. SW maintained that defendant never physically injured her, despite her previous statement. Later during the trial, the prosecution called as a witness Officer Allen, who was the officer that took SW's initial statement. Officer Allen testified that SW had a scar on her head and informed him that defendant had recently been physically abusive.

The evidence was logically relevant to SW's credibility and bias. The crux of Cooper's defense was that someone else shot and killed the victim in a drug-related incident. That defense relied on the fact that SW also was shot while defendant was in jail. Defendant wished for the jury to make the inference that if SW was shot shortly after the victim, then the two shootings must have been related, and because defendant was in jail for the second one, he could not possibly be guilty of either. SW provided important testimony for that defense, so her credibility was a material issue at trial. See *Layher*, 464 Mich at 763-764. Further, the evidence of defendant's previous violence toward SW was highly probative of SW's credibility. As our Supreme Court noted, "[b]ias may be induced by a witness' . . . fear of a party . . . ." *Id.*, quoting *Abel*, 469 US at 52. Thus, SW's bias toward defendant, in the form of her fear of him, made it more likely that SW was providing testimony that would be favorable to defendant's claimed

defense. The jury, as the "finder of fact and weigher of credibility," was "entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *Layher*, 464 Mich at 763, quoting *Abel*, 469 US at 52.

In regard to JB's testimony, one of the primary issues at trial was defendant's identity as the shooter. At trial, JB testified that defendant had a gun that the firearms examiner would later testify was consistent with the gun that was used to kill the victim. The fact that defendant had a gun that correlated to the fired bullets and expended shell casings at the scene of the murder made it more likely that defendant was the shooter. Thus, JB's credibility was relevant to a material issue—whether defendant was the perpetrator of the murder. *Denson*, 500 Mich at 401. JB was confronted, however, with the fact that he had previously withheld that information from the police. The proffered evidence that JB was afraid of defendant due to previous physical interactions, and therefore felt the need to lie to police about defendant's gun, was significantly probative of JB's bias, and thus, his credibility. The fact that JB was afraid of defendant when he originally spoke with police makes it more likely that he lied by omission during the first interview and was telling the truth at trial. Therefore, defendant's prior abuse of JB was logically relevant to a material issue at trial. *Id*.; *Layher*, 464 Mich at 763.

We must also consider whether pursuant to MRE 403 the evidence should be excluded because the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. As discussed, the evidence was highly probative of JB's and SW's biases while providing certain testimony, and therefore was probative of their credibility. The Michigan and the United States Supreme Courts have provided that the credibility of a witness based on that witness's potential bias is an important issue for the jury to consider. *Layher*, 464 Mich at 763; *Abel*, 469 US at 52. Further, SW's and Officer Allen's testimony about defendant's interaction with SW had a "heightened probative value," due to similarities between the murder and defendant's assault of SW. See *Bass*, 317 Mich App at 261. In other words, not only did the evidence regarding SW suggest that SW was likely afraid of defendant and consequently was tailoring her testimony so as to avoid his anger, but it also supported defendant's identity as the perpetrator considering that he got violent with SW after becoming jealous about her potentially seeing another man. See *id*. Notably, the evidence suggested that jealousy was also the motive behind defendant's ultimate murder of the victim. Thus, the danger of unfair prejudice of the evidence of SW's injuries at the hands of defendant did not substantially outweigh the "heightened probative value" of that evidence. *Id*.; MRE 403.

JB's testimony, meanwhile, helped to establish one of the primarily challenged issues at trial—defendant's identity as the perpetrator. The fact that defendant owned a gun that matched the one used to kill the victim was highly probative of that material issue. Thus, JB's credibility was also important at trial, and the fact that he previously withheld information about the defendant's gun from police created an inference that his testimony at trial was potentially not truthful. Therefore, JB's fear of defendant when originally speaking with the police, while defendant was still on the run, shows the bias of JB's initial statement, making his trial testimony more likely to be true. Given the high probative value of JB's potential bias with respect to defendant's identity as the shooter and the slim chance that a jury would convict defendant of murder for previously physically engaging with his step-son, we conclude the evidence was properly not excluded under MRE 403. See *Mills*, 450 Mich at 75.

-14-

In sum, the trial court did not abuse its discretion in admitting the challenged evidence at trial, see *Layher*, 464 Mich at 763. And even if there were errors, they did not require reversal because, given the overwhelming evidence of defendant's guilt previously summarized in this opinion, defendant suffered no prejudice. MCL 769.26.[4]

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that he was denied his constitutional right to the effective assistance of counsel. Because the record reflects that defense counsel's representation was not constitutionally deficient, we disagree.

## A. PRESERVATION & STANDARD OF REVIEW

In order to preserve a claim of ineffective assistance of counsel, a defendant is required to "move the trial court for a new trial or a *Ginther*[5] hearing." *People v Jackson*, 313 Mich App 409, 431; 884 NW2d 297 (2015). The record is plain that defendant never moved for a new trial on the ground of ineffective assistance of counsel or for a *Ginther* hearing, so this issue is unpreserved. *Id*. "Appellate review of an unpreserved argument of ineffective assistance of counsel, like this one, is limited to mistakes apparent on the record." *Johnson*, 315 Mich App at 174. "The denial of effective assistance of counsel is a mixed question of fact and constitutional law, which are reviewed, respectively, for clear error and de novo." *People v Schrauben*, 314 Mich App 181, 189; 886 NW2d 173 (2016), quoting *Brown*, 279 Mich App at 140.

## B. APPLICABLE LAW & ANALYSIS

"Criminal defendants have a right to the effective assistance of counsel under the United States and Michigan Constitutions." *Schrauben*, 314 Mich App at 189-190, citing US Const, Am VI; Const 1963, art 1, § 20. "However, effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *Schrauben*, 314 Mich App at 190. The United States Supreme Court has held that "in order to receive a new trial on the basis of ineffective assistance of counsel, a defendant must establish that 'counsel's representation fell below an objective standard of reasonableness' and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012), quoting *Strickland v Washington*, 466 US 668, 688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "When reviewing defense counsel's performance, the reviewing court must first objectively 'determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.' " *Jackson*, 313 Mich App at 431, quoting *Strickland*, 466 US at 690. "Next, the defendant must show that trial counsel's deficient performance prejudiced his defense—in other words, that 'there is a reasonable probability that, but for counsel's

---

[4] Again, as analyzed in note 3, *supra*, this evidence also was properly admitted pursuant to MRE 404(b).

[5] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

unprofessional errors, the result of the proceeding would have been different.' " *Jackson*, 313 Mich App at 431, quoting *Vaughn*, 491 Mich at 669. This Court will not find trial counsel to be ineffective where an objection would have been futile. *Thomas*, 260 Mich App at 457.

Defendant first asserts that trial counsel was ineffective for failing to object to portions of the prosecution's closing argument wherein the prosecution inappropriately shifted the burden of proof to defendant. As discussed, *supra*, most of the prosecution's arguments challenged by defendant were proper attacks on the credibility of the defense's theory of the case. Because those arguments were proper, any objection by defense counsel would have been futile, so his actions did not amount to ineffective assistance of counsel. *Thomas*, 260 Mich App at 457.

Defense counsel, however, also failed to object to the prosecution's suggestion that defendant should have produced evidence that he was somewhere other than the scene of the crime. We noted, *supra*, that this argument by the prosecution was improper. Given the lack of a *Ginther* hearing, however, there is nothing on the record to suggest that defense counsel's failure to object to that argument was not a trial strategy. It is logical to assume that defense counsel may have avoided objecting to the prosecution's assertion because it would have placed additional focus on the fact that there was no exculpatory evidence of defendant's location admitted at trial. This Court and our Supreme Court have "recognized that 'there are times when it is better not to object and draw attention to an improper comment.' " *People v Horn*, 279 Mich App 31, 40; 755 NW2d 212 (2008), quoting *People v Bahoda*, 448 Mich 261, 287 n 54; 531 NW2d 659 (1995). "Furthermore, declining to raise objections, especially during closing arguments, can often be consistent with sound trial strategy." *Unger*, 278 Mich App at 242. Because our review of this unpreserved issue is limited to mistakes apparent on the record, and the record provides that defense counsel's failure to object was likely due to trial strategy, defendant has failed to overcome the strong presumption that defense counsel's strategy was reasonable. See *id*. at 243. This Court will not second guess matters of trial strategy. *People v Rockey*, 237 Mich App 74, 76-77; 601 NW2d 887 (1999). Thus, defense counsel's failure to object did not fall below an objective standard of reasonableness. *Id*. Furthermore, given the brevity of the prosecution's statement and the significant evidence of defendant's guilt, even if defense counsel's failure to object did fall below an objective standard of reasonableness, *Vaughn*, 491 Mich at 669, defendant still failed to prove the second prong of an ineffective assistance of counsel claim—that it was reasonably likely that "the result of defendant's trial would have been different" absent the alleged mistake. *Unger*, 278 Mich App at 243.

Next, defendant, in his Standard 4 brief, argues that defense counsel was ineffective for failing to prepare an alibi defense. Defendant contends that Tamika McEwen, his aunt, could have testified that defendant was with her during the time of the murder, but defense counsel did not interview her or call her as a witness. Additionally, defendant argues that defense counsel should have obtained and admitted video evidence from the security camera focused on the parking lot of Brian's apartment. Defendant contends that the video would have shown someone else exiting the vehicle, thereby supporting his assertion that he was not the person driving the black Cadillac.

Defense counsel's "[d]ecisions regarding what evidence to present . . . are presumed to be matters of trial strategy." *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004) (internal quotation marks omitted). "This Court will not substitute its judgment for that of

-16-

counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight." *Rockey*, 237 Mich App at 76-77. "The defendant 'bears the burden of demonstrating both deficient performance and prejudice[;] the defendant [also] necessarily bears the burden of establishing the factual predicate for his claim.' " *People v Cooper*, 309 Mich App 74, 80; 867 NW2d 452 (2015), quoting *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).

As noted, defendant first argues that McEwen could have provided an alibi for defendant at the time of the crime. Michigan law is clear that defendant bears the burden of establishing a factual predicate for his claim. *Cooper*, 309 Mich App at 80. There was nothing in the trial court record to support that McEwen could provide such testimony. Thus, defendant failed to carry his burden of establishing the factual predicate for his claim of ineffective assistance of counsel. *Id*.[6]

Defendant also failed to bear the burden of establishing the factual predicate for his claim that defense counsel should have reviewed video evidence which would have provided defendant with an alibi. While defendant directs this Court to a police report suggesting that video of a suspect exiting the vehicle and walking through the lawn of the apartment complex does exist, the evidence does not support that the "suspect" seen walking in the lawn appeared materially different than defendant. It is equally likely that the video showed a man that was similar in appearance to defendant, the video was too dark for a juror to identify the person as looking like anyone, or did not show any man at all. In any case, the mere fact that a video may have existed does not support a factual predicate for defendant's claim. Instead, the factual predicate for defendant's claim requires proof that the video showed a suspect that was at least plausibly dissimilar to defendant's appearance. Given the lack of such evidence on the record, defendant failed to bear the burden of proving the factual predicate for his claim, and thus has provided no reason for us to reverse his convictions. *Cooper*, 309 Mich App at 80.

Apparently foreseeing his issue with establishing a factual predicate, defendant, in his Standard 4 brief, alternatively urges us to remand to the trial court for an evidentiary hearing to better establish the record on these issues. The decision whether to order a remand for an evidentiary or *Ginther* hearing is within our discretion. *People v Hernandez*, 443 Mich 1, 15; 503 NW2d 629 (1993), abrogated on other grounds by *People v Mitchell*, 454 Mich 145, 176; 560 NW2d 600 (1997). We decline defendant's invitation, not only because he failed to properly move for remand pursuant to MCR 7.211(C)(1), but also because his "offers of proof" are not

---

[6] We acknowledge that defendant attached an affidavit to his Standard 4 brief on appeal, in which he, and notably not McEwen, avers that she would have testified that defendant was with her during the victim's murder, that he informed defense counsel of that potential testimony, and that defense counsel failed to follow up on it. We are not permitted to consider this affidavit, because it was "not present[ed] . . . in the lower court," and defendant is not permitted to "expand the record on appeal." *People v Nix*, 301 Mich App 195, 203; 836 NW2d 224 (2013); MCR 7.210(A)(1). Further, absent an affidavit from McEwen herself, defendant has provided us with nothing more than inadmissible hearsay evidence about his potential alibi. MRE 803.

convincing. MCR 7.211(C)(1). We also note that, given the sheer amount of evidence showing that defendant killed the victim, there is no reasonable probability that the jury would have acquitted defendant if he provided alibi testimony from an inherently biased witness—a family member—and a necessarily dark video from a security camera. Consequently, we believe a remand would be futile, because defendant still would be unable to satisfy the second prong of his ineffective assistance of counsel claim. *Vaughn*, 491 Mich at 669; *Strickland*, 466 US at 688.

Defendant has failed to overcome the "heavy burden of proving" that defense counsel rendered ineffective assistance of counsel. *Schrauben*, 314 Mich App at 190.

## VI. MOTION FOR A NEW TRIAL & EX PARTE COMMUNICATION

Defendant, in his Standard 4 brief, contends that the trial court abused its discretion by relying on the travel restrictions of the victim's family in denying his motion for a new trial, and that he was denied a fair trial or due process of law when the trial court held an ex parte meeting with the prosecution, the lead investigating officer, and the victim's father. Because defendant's arguments have no basis in fact, we disagree.

As the appellant, "defendant [bears] the burden of furnishing the reviewing court with a record to verify the factual basis of any argument upon which reversal was predicated." *People v Elston*, 462 Mich 751, 762; 614 NW2d 595 (2000). Stated differently, this Court will not reverse a conviction where the defendant has failed to establish the factual predicate for his claim. *Id.*; see also *People v Lee*, 391 Mich 618, 626-627; 218 NW2d 655 (1974) (holding that a defendant must "give us a record on which to make a judgment.").

The record shows that the trial court referenced the family's travel plans when denying defendant's motion to adjourn the sentencing hearing, not in denying defendant's motion for a new trial. Thus, there is no factual basis whatsoever for defendant's claim of error. Consequently, because defendant did not bear his burden of establishing a factual predicate for his claim, we have been provided no grounds to consider reversal. See *Elston*, 462 Mich at 762.

Similarly, defendant has not directed us to any portion of the record where an ex parte communication occurred, and a review of the entire trial transcript does not reveal any such event. Thus, defendant has failed to provide a factual predicate for his claim that would allow us to review it. *Id*.

## VII. CONCLUSION

We find no errors that warrant reversal of defendant's convictions.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Jane E. Markey
/s/ Michael J. Riordan